**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| IN RE SUPREMA SPECIALTIES, INC. | : | **OPINION** |
| SECURITIES LITIGATION | : | |
| | : | Master File No. 02-168 (WHW) |
| | : | |
| | : | |

**Walls, Senior District Judge**

Lead Plaintiff Teachers' Retirement System of Louisiana moves for approval of the partial class action settlement with Defendants Rudolph Acosta, Jr., Paul Desocio, and Barry S. Rutcofsky (the "Director Defendants"), Defendant BDO Seidman, LLP ("BDO"), and Defendants Janney Montgomery Scott LLC, Pacific Growth Equities, Inc., and Roth Capital Partners, LLC (the "Underwriter Defendants") (collectively, with the Director Defendants and BDO, the "Settling Defendants") and the Plan of Allocation. Lead Plaintiff also moves for an award of attorneys' fees and reimbursement of litigation expenses. Following a final approval hearing held on March 18, 2008, Lead Plaintiff's motions are granted.

### FACTS AND PROCEDURAL BACKGROUND

Beginning on January 14, 2002, plaintiffs filed thirteen putative securities fraud class actions in the District of New Jersey, alleging claims in connection with activities at Suprema Specialties, Inc. ("Suprema"), a manufacturer of fine Italian cheeses. On February 28, 2002 and March 28, 2002, these class actions were consolidated under the caption In re Suprema Specialties, Inc. Securities Litigation, and on July 1, 2002, the Teachers' Retirement System of

**NOT FOR PUBLICATION**

Louisiana was appointed Lead Plaintiff. Lead Plaintiff filed its Second Amended Complaint on

January 30, 2004, alleging the following claims:

- Violations of Section 11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k, by all Defendants;
- Violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, by Defendants Mark Cocchiola and Steven Venechanos (the "Officer Defendants") and the Underwriter Defendants;
- Violations of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, by the Officer Defendants and BDO;
- Violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, by the Officer Defendants; and
- Violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), by the Officer Defendants.

The Court granted Defendants' motion to dismiss the Second Amended Complaint on August 26,

2004, but on February 23, 2006, the Third Circuit reversed the Court's dismissal. On April 23,

2007, the Court granted Lead Plaintiff's motion for class certification pursuant to Fed. R. Civ. P.

23(a) and 23(b)(3), certifying, with certain exclusions, the following Class:

> [A]ll persons or entities who (i) acquired Suprema common stock in the 2001 Secondary Offering pursuant to the Registration Statement; or (ii) acquired Suprema common stock during the period from September 27, 2000, through December 21, 2001, inclusive . . ., and who suffered damages as a result of said acquisition.

Lead Plaintiff and the Settling Defendants entered into a settlement agreement on August 15,

2007.[1] On December 12, 2007, the Court preliminarily approved the partial class action

settlement and directed that notice of it be given to the Class. Lead Plaintiff moved for approval

---

[1] Three Defendants were not part of this settlement agreement: the Officer Defendants and the Estate of Marco Cocchiola. On December 17, 2007, the Court entered an Order, allowing for Lead Plaintiff's voluntary dismissal of Defendant Steven Venechanos without prejudice. The Court preliminarily approved a partial class action settlement between Lead Plaintiff and Defendants Mark Cocchiola and the Estate of Marco Cocchiola on March 18, 2008.

NOT FOR PUBLICATION

of the partial class action settlement and the Plan of Allocation and for an award of attorneys'

fees and reimbursement of litigation expenses on February 25, 2008.  The Court held a hearing

on the motions on March 18, 2008.

1.      <strong>Stipulation of Settlement</strong>

Under the terms of the settlement, the Settling Defendants paid $19 million in cash,

which has been deposited into an escrow account.  (Lead Pl.'s Mem. (No. 324), Ex. 1

(hereinafter, "Stip. of Settlement") ¶ 2.)  The specific breakdown of the settlement is (1) BDO -

$9.5 million; (2) the Underwriter Defendants - $7 million; and (3) the Director Defendants - $2.5

million.  (Id.)  It was not a claims-made settlement.[2]  (Id. ¶ 11.)  The Settling Defendants denied

that they committed any wrongdoing in connection with this action and that Lead Plaintiff or

other Class members sustained or are entitled to recover damages as a result of this action.  (Id. ¶

O.)

Lead Plaintiff and the Settling Defendants also negotiated the settlement with individual

plaintiffs Special Situations Fund, III, L.P. and Special Situations Cayman Fund, L.P.

(collectively, "SSF"), which had asserted various claims overlapping with the claims asserted on

behalf of the Class in the action Special Situations Fund, III, L.P. v. Cocchiola, Civ. Action No.

02-3099 (WHW), in order for the Settling Defendants to achieve a global settlement of all claims

regarding their alleged misconduct in connection with Suprema.  (Id. ¶ 3.)  Lead Plaintiff and the

Settling Defendants agreed to treat certain open-market purchases made by SSF in the two-week

---

[2]  In other words, the Settling Defendants will not have any right to return of the
settlement or any portion thereof irrespective of the number of proofs of claim filed, the
collective amount of losses of authorized claimants, the percentage of recovery of losses, or the
amounts to be paid to authorized claimants from the settlement.  (Stip. of Settlement ¶ 11.)

NOT FOR PUBLICATION

period immediately before the beginning of the Class period as if such shares were purchased on

the first day of the Class period.  (Id.)

Each person claiming to be an authorized claimant was required to submit a timely proof

of claim supported by proof of all purchases or acquisitions and sales of Suprema common stock.

(Id. ¶ 20.5.)  Unless otherwise ordered by the Court, individuals who failed to submit timely

proofs of claim are barred from receiving payments, but, in all other respects, are subject to and

bound by the settlement.  (Id. ¶ 20.6.)  Lead Plaintiff, and all Class members who do not

otherwise request exclusion from the Class, release the Settling Defendants from claims.  (Id. ¶

24.)  As such the Judgment entered in this action includes a bar order, barring future claims for

contribution or indemnification.  (See Judgment ¶ 12.)

### 2.        Plan of Allocation

The Plan of Allocation was distributed to Class members as part of the Notice of (1)

Pendency of Class Action and (2) Hearing on Proposed Partial Settlement and Attorneys' Fee

Petition and Right to Share in Net Settlement Fund (the "Notice").  The settlement is to be

distributed in the following manner:

- Taxes and tax expenses owed by the settlement;
- Costs and expenses of providing notice of and administering the settlement;
- Lead Plaintiff's counsel's ("lead counsel") costs and expenses;
- Lead counsel's attorneys' fees; and
- Distribution to authorized claimants in accordance with the Plan of Allocation.

(Decl. of Mark Lebovitch ("Lebovitch Decl."), Ex. B (Aff. of Michelle M. La Count, Esq.), Ex.

A. (hereinafter, "Notice") ¶ 36.)

NOT FOR PUBLICATION

According to the Plan of Allocation, a "loss amount" was calculated for each purchase or acquisition of Suprema common stock, depending on when the shares were purchased or otherwise acquired and whether they were held until the conclusion of the Class period or sold during the Class period, and if so, when they were sold.  (Id. ¶ 42.)  Loss amounts were reduced dollar-for-dollar to the extent that Suprema common stock was purchased or otherwise acquired at a price below the lowest reported trading price for Suprema common stock on the date during the Class period on which the purchase or acquisition was made.  (Id. ¶ 47.)  "Recognized Gains and Losses" are detailed as follows:

> • **Shares of Suprema common stock that were acquired pursuant to the Registration Statement filed on November 6, 2001, for Suprema's Secondary Offering (the "Section 11 Shares") and held until the close of trading on December 21, 2001:** For each share of Suprema common stock that was acquired pursuant to the Registration Statement filed in connection with Suprema's Secondary Offering and that was <u>still held</u> at the close of trading on December 21, 2001, the Recognized Loss is $12.75.

> • **Shares other than the Section 11 Shares that were purchased or otherwise acquired during the period from September 27, 2000, through and including December 21, 2001, and held until the close of trading on December 21, 2001 (the "Section 10 (b) Shares"):** For each share of Suprema common stock that was purchased or otherwise acquired during the period from September 27, 2000, through and including December 21, 2001 . . . and that was still held at the close of trading on December 21, 2001, the Recognized Loss is equal to the lesser of i) the purchase price or ii) $13.00.

(Id. ¶ 48.iii.)

Not all claims were asserted against all Settling Defendants.  (Id. ¶ 48.iv.)  As a result, the "Section 11 Fund," which will be allocated only to authorized claimants who purchased Section 11 Shares, is comprised of 100% of the recoveries from the Director Defendants and the Underwriter Defendants and 56% of the recovery from BDO.  (Id.) The "Section 10(b) Fund" is

**NOT FOR PUBLICATION**

comprised of the remaining 44% of the recovery from BDO.  (Id.) The Section 11 and Section

10(b) Funds will be distributed on a pro rata basis to authorized claimants whose recognized

losses arise from the purchase of Section 11 and Section 10(b) shares, respectively.  (Id.)  To the

extent that the amount available in either Fund exceeds its respective aggregate amount of

recognized losses, the excess will be allocated to the other Fund.  (Id.)

Each authorized claimant was required to provide proof of their ownership positions in

Suprema common stock as of the close of trading on September 26, 2000, and December 21,

2001, and proof of all transactions in Suprema common stock, including all purchases and sales

made during the Class period.  (Id. ¶ 48.v.b.)  In the event that a Class member had more than

one purchase or sale of Suprema common stock during the Class period, all purchases and sales

were matched on a "First In, First Out" basis.  (Id. ¶ 48.v.c.)  To determine whether a claimant

has a gain or loss from his transactions in Suprema stock during the Class period, the claims

administrator performed a calculation to:

- Total the amount that the claimant paid for all Suprema common stock purchased or otherwise acquired during the Class period (the "Total Purchase Amount");
- Match any sales of Suprema common stock during the Class period first against the claimant's opening position in the stock (the proceeds of those sales will not be considered for purposes of calculating gains or losses);
- Total the amount received for sales of the remaining shares of Suprema common stock sold during the Class period (the "Sales Proceeds"); and
- Ascribe a $0.00 per share holding value for the number of shares of Suprema common stock purchased or otherwise acquired during the Class period and still held at the end of the Class period (the "Holding Value").

(Id. ¶ 48.v.e.)  The difference between the Total Purchase Amount and the sum of the Sales

Proceeds and the Holding Value was deemed a claimant's gain or loss on his transactions in

Suprema common stock during the Class period.  (Id.)  A payment to any authorized claimant of

NOT FOR PUBLICATION

less than $10.00 in total was not included in the calculation and will not be distributed.  (Id. ¶ 48.v.f.)

### STANDARDS AND DISCUSSION

### 1.    Motion for Approval of the Partial Class Action Settlement

Fed. R. Civ. P. 23(e)(2) states that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. . . .  If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate."  The Third Circuit has identified nine factors that bear on whether a settlement is fair, reasonable, and adequate:

> (1) the complexity and duration of the ligation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation.

In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 785-86 (3d Cir. 1995) (citing Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975)).  "The proponents of the settlement bear the burden of proving that these factors weigh in favor of approval."  Id.  "These factors are a guide and the absence of one or more does not automatically render the settlement unfair.  Rather, the court must look at all the circumstances of the case and determine whether the settlement is within the range of reasonableness under Girsh."  In re Orthopedic Bone Screw Prods. Liab. Litig., 176 F.R.D. 158, 184 (E.D. Pa. 1997).

NOT FOR PUBLICATION

### A.    The Complexity and Duration of the Litigation

Lead Plaintiff argues that "due to the factual and legal complexities . . . continued litigation would necessarily be extremely expensive and time-consuming."  (Lead Pl.'s Mem. (No. 341-3) at 15.)  According to Lead Plaintiff, "the parties have already spent more than five years litigating the case."  (Id.)  Further, Lead Plaintiff suggests that "because this Court had once dismissed all of Lead Plaintiff's claims, Lead Plaintiff . . . faced the prospect of substantial motions for summary judgment," that "trial would have involved substantial attorney and expert time, voluminous documentary and deposition evidence, vigorously contested motions, and the considerable use of judicial resources," and that "post-trial motions and the appellate process would likely deny the Class any recovery for years."  (Id. at 13-14.)

The Underwriter Defendants agree with Lead Plaintiff, stating that federal securities law is "a complex area of legal practice" and that "the difficult issues surrounding the business and accounting principles at issue would necessarily have been presented through substantial lay and expert testimony."  (Underwriter Defs.' Mem. at 6.)  In addition, the Underwriter Defendants confirm that "[a]bsent a settlement, the 2001 Underwriters would continue to vigorously defend themselves in proceedings before this Court and/or the Third Circuit that could last for years." (Id.)

### B.    The Reaction of the Class to the Settlement

Lead Plaintiff asserts that "[a]lthough the Claims Administrator disseminated more than 13,000 Notices to potential Class members, to date, no Class members have objected to the Settlement and none have requested exclusion from the Settlement."  (Lead Pl.'s Mem. (No. 341-3) at 14; see Underwriter Defs.' Mem. at 7.)

NOT FOR PUBLICATION

### C.    The Stage of the Proceedings

According to Lead Plaintiff, "Lead Counsel, over a period of more than five years, has conducted an extensive investigation, significant discovery and pushed this case forward in a manner favorable to the Class, positioning themselves to obtain a strong settlement," the details of which are set forth in the Declaration of Mark Lebovitch (the "Lebovitch Declaration").  (Lead Pl.'s Mem. (No. 341-3) at 15-16.)    Similarly, the Underwriter Defendants argue that "full discovery is not a prerequisite to approval of a class settlement" and that "[t]he parties' understanding of the issues underlying the dispute are manifested in several filings with this Court . . . as well as the voluminous mediation briefs and the mediated settlement negotiations." (Underwriter Defs.' Mem. at 8-9.)

### D.    The Risks of Establishing Liability

Lead Plaintiff maintains that "Defendants have hotly disputed that any of their statements . . . were false and misleading, and also point to this Court's earlier decisions dismissing Lead Plaintiff's claims" and that "the complexity of pleading and establishing scienter and loss causation, in particular . . . is increasing."  (Lead Pl.'s Mem. (No. 341-3) at 16.)  The Underwriter Defendants report that Lead Plaintiff would have difficulty establishing liability in a number of respects, namely that "Plaintiffs can not establish that the 2001 Underwriters did not undertake a 'reasonable investigation' with regards to the 2001 Offering, which is a complete bar to recovery" and that "Plaintiffs must establish that they purchased securities in the 2001 Offering and therefore have standing to pursue a Securities Act claim."  (Underwriter Defs.' Mem. at 12-13.)

NOT FOR PUBLICATION

### E.    The Risks of Establishing Damages

Lead Plaintiff argues that "[u]ltimately, proving damages would come down to 'a battle of experts,' and it is impossible to predict which expert and theory of damages the jury would accept." (Lead Pl.'s Mem. (No. 341-3) at 18.)  The Underwriter Defendants confirm this "battle of experts," listing a number of disagreements that they and Lead Plaintiff have had with respect to damages.  (See Underwriter Defs.' Mem. at 14.)  According to the Underwriter Defendants, they "would have vigorously contested Plaintiffs' damages analysis and would have argued, among other things, that the drop in Suprema's securities price was not unique to Suprema and affected other companies in Suprema's peer group."  (Id.)

### F.    The Risks of Maintaining a Class Action

According to Lead Plaintiff, although the Court has certified the Class in this case, "there is always the risk that the action, or particular claims in the action, might not be maintained as a class through trial." (Lead Pl.'s Mem. (No. 341-3) at 18.)  The Underwriter Defendants also claim that "even if decertification risk is not significant, the weight of the other Girsh factors should compel the Court to approve the settlement." (Underwriter Defs.' Mem. at 17.)

### G.    The Ability of the Defendants to Withstand a Greater Judgment and the Range of Reasonableness of the Settlement in Light of the Best Recovery and All the Attendant Risks of Litigation

Lead Plaintiff asserts that "this case involves some collectibility issues." (Lead Pl.'s Mem. (No. 341-3) at 19.)  Lead Plaintiff states that "[b]ecause Suprema has been liquidated, the only source of recovery are the Settling Defendants and certain other individuals" and that "because of the nature of Lead Plaintiff's allegations, BDO and the Underwriter Defendants may have substantial defenses both to the claims asserted under Section 11 of the Securities Act and

-10-

NOT FOR PUBLICATION

Section 10(b) of the Exchange Act."  (Id. at 19.)  Lead Plaintiff offers that "[p]articularly in light of the fact that this Court had once dismissed all of Lead Plaintiff's claims . . . the cash settlement amount of $19 million makes this Settlement represent more than a mere 'reasonable' result," suggesting that the settlement, which is "over 22% of its total damages[,] is an outstanding result for the Class."  (Id. at 20.)

The Underwriter Defendants note that "[n]one of the 2001 Underwriters had insurance and there is no evidence that they could have withstood a greater judgment," but that "[e]ven if they arguably could have withstood a judgment for an amount greater than the proposed settlement, this not a basis to disapprove the proposed settlement."  (Underwriter Defs.' Mem. at 17.)  According to the Underwriter Defendants, "Plaintiff recovered a substantial cash amount for their claims, in excess of the average recovery in typical cases."  (Id. at 18.)

*     *     *

Factors (1), (2), (4), (5), and (9) overwhelmingly support approval.  With respect to factor (1), The litigation is undoubtedly complex and this case has already lasted over five years, with an appellate record.  Regarding factor (2), that no Class members have objected (or even requested exclusion) suggests fairness and reasonableness.  And, as for factors (4), (5), and (9), the risks of establishing liability and damages go hand-in-hand with the complexity of the subject matter, as does the range of reasonableness of the settlement in light of the attendant risks of litigation, particularly given that the Court has already dismissed Lead Plaintiff's Second Amended Complaint, though such dismissal was reversed by the Third Circuit.

Factor (3) also supports approval, despite that this case is still in the fact discovery phase. As stated above this case has stretched over five years, undoubtedly leading to a large amount of

NOT FOR PUBLICATION

accumulated knowledge for all parties.  Extensive settlement mediation, as well as motion

practice ranging from motions to dismiss that reached the Third Circuit and class certification

motions, further support the claim of the parties' extensive knowledge of the facts and law in this

case.

Factors (7) and (8) are somewhat unknown, but likely also support approval.  With

respect to factor (7), it is uncertain whether Defendants could withstand a greater award.  The

Underwriter Defendants claim that they had no insurance.  But, BDO and the Director

Defendants have not offered any discussion on this issue.  Regarding factor (8), the best recovery

is unclear.  Lead Plaintiff's damages expert estimates damages of over $85 million.  (See

Lebovitch Decl., Ex. C (Decl. of Candace L. Preston, CFA ("Preston Decl.")) ¶ 19.)  Lead

Plaintiff's argument that recovery of nearly 22% of that total is a solid award is convincing,

however, particularly in light of the fact that the allegedly greatest wrongdoer in this case,

Suprema, has been liquidated and, as a result, is unable to participate in any damages award.

The only factor that may not support approval is factor (6).  The Court has already

certified the Class, though it is noted that such a determination could potentially be reversed.

Overall, the totality of the factors supports approval of the partial class action settlement.

Accordingly, the Court grants Lead Plaintiff's motion for approval of the partial class action

settlement.

## 2.    Motion for Approval of the Plan of Allocation

"Approval of a plan of allocation of a settlement fund in a class action is 'governed by the

same standards of review applicable to approval of the settlement as a whole: the distribution

plan must be fair, reasonable and adequate.'"  In re Computron Software, Inc., Sec. Litig., 6 F.

NOT FOR PUBLICATION

Supp. 2d 313, 321 (D.N.J. 1998) (quoting Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1284-85 (9th Cir. 1992)).  "A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable."  Id. (quotation omitted).

Lead Plaintiff claims that "the proposed Plan of Allocation is fair and reasonable because it calculates each Class Member's recognized loss depending on the relative strength of the claims."  (Lead Pl.'s Mem. (No. 341-3) at 21.)  According to Lead Plaintiff, as a result "those Class Members who have Section 11 claims will share in a larger fund than those Class Members who only have claims under Section 10(b), because, as disclosed in the Notice, not all claims were asserted against all of the Settling Defendants."  (Id.)

In support of the Plan of Allocation, Lead Plaintiff also filed the Declaration of Candace L. Preston, CFA (the "Preston Declaration").  The Preston Declaration states that the Plan of Allocation is based upon evidence regarding loss causation and an empirical "event study" methodology.  (Preston Decl. ¶¶ 3-10.)  It notes that the Plan of Allocation has two components – (1) the recognized losses for the Section 11 Shares and the Section 10(b) Shares; and (2) the allocation of the settlement.  (Id. ¶ 11.)  First, according to the Preston Declaration, the recognized losses are those losses computed based upon the "event study" methodology – i.e., $12.75 for Section 11 Shares and $13.00 for Section 10(b) Shares.[3]  (Id.)  The Preston Declaration states that the Private Securities Litigation Reform Act limits recovery for Section 10(b) Shares to the lesser of the purchase price or $13.00.  (Id.)  Second, the Preston Declaration observes that the allocation of the settlement reflects that not all claims were asserted against all

_____

[3] Paragraphs 3-10 of the Preston Declaration describe the "event study" methodology in greater detail.

NOT FOR PUBLICATION

of the Settling Defendants and that the threshold for liability for Section 11 is lower than it is for

Section 10(b), so Section 11 Shares will recover from a larger pool of the settlement than will the

Section 10(b) Shares.  (Id. ¶ 12.)

Lead Plaintiff's arguments are convincing as to why Section 11 and Section 10(b) Shares

are treated differently.  The Plan of Allocation is further buttressed by the Preston Declaration,

which details the bases behind how benchmarks were arrived upon and any differential treatment

among shareholders.  As such the Court grants Lead Plaintiff's motion for approval of the Plan of

Allocation, finding it fair, reasonable, and adequate.

### 3. Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses

Fed. R. Civ. P. 23(h) states that "[i]n a certified class action, the court may award

reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties'

agreement."  In "common fund" cases, a district court should generally apply the percentage-of-

recovery method of computing attorneys' fees.  In re Cendant Corp. PRIDES Litig., 243 F.3d

722, 732, 734 (3d Cir. 2001).  In determining what percentage-of-recovery is appropriate, a court

should consider several factors, including:

> (1) the size of the fund created and the number of persons benefitted; (2) the
> presence or absence of substantial objections by members of the class to the
> settlement terms and/or fees requested by counsel; (3) the skill and efficiency of
> the attorneys involved; (4) the complexity and duration of the litigation; (5) the
> risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs'
> counsel; and (7) the awards in similar cases.

Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000).  These factors "need

not be applied in a formulaic way," and their weight may vary on a case-by-base basis.  Id.

NOT FOR PUBLICATION

In addition to the percentage-of-recovery method, the Third Circuit has suggested that it is advisable to cross-check the percentage-of-recovery award requested by counsel against the lodestar method of awarding fees so as to insure that plaintiff's lawyers are not receiving an excessive fee at their clients' expense.  In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005); Gunter, 223 F.3d at 195 n.1.  "A lodestar award is calculated by multiplying the number of hours he or she reasonably worked on a client's case by a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer."  Oh v. AT & T Corp., 225 F.R.D. 142, 153 (D.N.J. 2004) (Walls, J.). To examine the lodestar method, a "Court should make explicit findings about how much time counsel reasonably devoted to a given matter, and what a reasonable hourly fee would be for such services."  Gunter, 223 F.3d at 199-200.  "Multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied."  In re Cendant Corp., Derivative Action Litig., 232 F. Supp. 2d 327, 341-42 (D.N.J. 2002) (Walls, J.).

Further, "[c]ounsel in common fund cases is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case."  In re Cendant, 232 F. Supp. 2d at 343.

### A.    Motion for an Award of Attorneys' Fees

Lead counsel seeks attorneys' fees constituting 22% of the net settlement – i.e., the settlement less Court-approved expenses – with interest at the same rate as earned by the settlement.

NOT FOR PUBLICATION

        (i)       **The Size of the Fund Created and the Number of Persons Benefitted**

Lead Plaintiff argues that "the size of the Settlement is an excellent result when weighed against the risks of continuing to litigate." (Lead Pl.'s Mem. (No. 341-4) at 12.) As example, Lead Plaintiff cites that its ability "to prevail on every single contested issue of liability and damages in this case . . . . would have been particularly challenging . . . given the serious risks Lead Plaintiff faced," that "with Suprema, the primary defendant, out of the case . . . the only sources of recovery were the Settling Defendants and certain other individuals," and that "defendants had substantial defenses to Lead Plaintiff's claims." (Id. at 13.) Lead Plaintiff notes that "[t]he number of persons benefitting from the Settlement is expansive as well . . . . [as] the Claims Administrator has identified more than 13,000 potential Class Members." (Id.)

        (ii)     **The Presence or Absence of Substantial Objections by Members of the Class to the Settlement Terms and/or Fees Requested by Counsel**

According to Lead Plaintiff, "[a]s of the date of the filing of this fee petition, there have been no objections to the request for attorneys' fees and reimbursement of out of pocket expenses or to the Settlement," and "[t]he absence of . . . objections to a fee request has been deemed significant evidence that a fee request is fair." (Id.)

        (iii)     **The Skill and Efficiency of the Attorneys Involved**

Lead Plaintiff asserts that "[l]ead counsel's success in bringing this litigation to a successful conclusion is perhaps the best indicator of the experience and ability of the attorneys involved." (Id. at 14.) Lead Plaintiff claims that lead counsel "conducted an extensive investigation relating to the allegations of wrongdoing" and "[o]ver the last five-and-a-half years . . . has diligently prosecuted this action." (Id. at 15.) In addition, as further evidence, Lead

NOT FOR PUBLICATION

Plaintiff points to the firm resume that was attached to the Lebovitch Declaration as Exhibit E. (Id. at 16.)  Moreover, Lead Plaintiff suggests that "[t]he quality and vigor of opposing counsel is also relevant in evaluating the quality of the services rendered by Lead Counsel" and that "Lead Counsel's ability to obtain such a favorable Settlement for the Class in the face of such a collection of formidable legal opposition further confirms the superior quality of Lead Counsel's efforts."  (Id.)

### (iv)    The Complexity and Duration of the Litigation

Lead Plaintiff believes that "[t]he complexity of both the factual and legal issues in this case was apparent from the outset," and "[t]o that end, Lead Counsel was faced with the difficult task of proving the securities violations in the Complaint in the face of opponents who were both capable of mounting a formidable defense and determined to do so."  (Id. at 17.)  Lead Plaintiff notes that "Lead Counsel has already engaged in a substantial amount of discovery" and that continued fact discovery, expert discovery, motion practice, and trial would only lengthen that time substantially.  (Id.)  Lead Plaintiff states that "under the percentage-of-recovery approach, a court should not penalize counsel for effectively litigating a case and obtaining a settlement prior to trial."  (Id.)

### (v)    The Risk of Nonpayment

According to Lead Plaintiff, "Lead Counsel undertook this Action on an entirely contingent fee basis."  (Id.)  And, Lead Plaintiff points out that "the Court dismissed all of Lead Plaintiff's claims."  (Id. at 19.)  Lead Plaintiff states that "Lead Counsel understood that ultimately there might not be any recovery, or if a judgment was obtained it could be delayed or overturned through appeal."  (Id.)

-17-

NOT FOR PUBLICATION

### (vi)    The Amount of Time Devoted to the Case by Plaintiffs' Counsel

Lead Plaintiff offers that "Lead Counsel has expended over 8,870 hours and advanced more than $497,847 in expenses on this case." (Id. at 20.)  Lead Plaintiff suggests that by devoting substantial resources to this case, "Lead Counsel not only substantially benefitted the Class, but also undertook a substantial risk in terms of opportunity cost, as lawyers who might otherwise handle several matters at a time were forced to concentrate solely on this matter." (Id. at 20-21.)

### (vii)    The Awards in Similar Cases

According to Lead Plaintiff, "while there is no general rule, the Third Circuit has observed that fee awards in common fund cases generally range from 19% to 45% of the settlement fund." (Id. at 21.)  Accordingly, Lead Plaintiff states that "the twenty-two percent fee requested in this Action is not only reasonable, but is substantially less than fees awarded by district courts within the Third Circuit in numerous other actions." (Id. at 22.)

*    *    *

All factors support lead counsel's suggested award of attorneys' fees of 22% of the net settlement.  First, "[a]s a general rule, as the size of a fund increases, the appropriate percentage to be awarded to counsel decreases." In re Cendant, 232 F. Supp. 2d at 337.  The Third Circuit has stated that "[t]he basis for this inverse relationship is the belief that '[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.'" In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 339 (3d Cir. 1998) (citation omitted).  In this case the size of the settlement is not particularly large, but neither is the percentage that lead counsel seeks.  In any event this is more

**NOT FOR PUBLICATION**

of a concern in "'mega'-fund case[s], which generally require awards of at least $100 million," In re Cendant, 232 F. Supp. 2d at 337, which this case does not qualify as being.

Second, there have been no objections by Class members to the settlement terms or the fees requested by lead counsel.  Third, the skill and efficiency of the attorneys involved is evident by reviewing lead counsel's firm profile and the résumés of its attorneys.  (See Lebovitch Decl., Ex. E.)  The Court is also impressed with lead counsel's successful settlement of this case, considering the Court's earlier ruling to dismiss the Second Amended Complaint and Suprema's absence as a viable contributor to any settlement due to its liquidation.

Fourth, this case's complexity is undeniable, given its facts and area of law, securities law.  In addition, this litigation has already lasted over five years, including a Third Circuit appeal and extensive motion practice, despite its pre-trial posture.  Fifth, although the Court has observed that "[s]ome courts have interpreted this factor as requiring an assessment of the likelihood that a successful verdict will go uncollected because of a defendant's potential bankruptcy, insolvency, or lack of assets," In re Cendant, 232 F. Supp. 2d at 339, other courts have recognized the risk of non-payment resulting from a contingency fee arrangement, see In re Ins. Brokerage Antitrust Litig., Civ. Nos. 04-5184, 05-1079, 2007 WL 2916472, at *5 (D.N.J. Oct. 5, 2007).  The risk of bankruptcy, insolvency, or lack of assets of the Settling Defendants appears low to nonexistent (though the Court should note that this precise risk has limited this settlement given Suprema's liquidation), but the Court notes that lead counsel had entered into a contingent fee arrangement, placing them at considerable risk of nonpayment.

Sixth, lead counsel has expended over 8,870 hours in litigating this matter, which, given the pre-trial posture of the case appears to be a significant amount of time.  Seventh, the Third

**NOT FOR PUBLICATION**

Circuit observed at one time that although percentages awarded have varied considerably, most

fee awards range "'from nineteen percent to forty-five percent of the settlement fund,'" In re

Cendant PRIDES, 243 F.3d at 736 (quoting In re Gen. Motors, 55 F.3d at 822), of which lead

counsel's requested fee award is at the low end.  Bearing in mind the Third Circuit's instruction

that district courts not "rely on a formulaic application of the appropriate range in awarding fees

but must consider the relevant circumstances of the particular case," id., the Court approves of

lead counsel's requested award of 22%.

### B.    Lodestar Cross-Check

Lead Plaintiff believes that "the lodestar method confirms the reasonableness of the

percentage fee being sought." (Lead Pl.'s Mem. (No. 341-4) at 22.)  Lead Plaintiff presents that

"Lead Counsel and its staff have spent a total of 8,870.55 hours on this case" with "rates [that]

vary appropriately between attorneys and between paralegals and other support staff, depending

on the position and experience level of the particular individual." (Id. at 23.)  According to Lead

Plaintiff, lead counsel's total lodestar is $3,666,163.00, as compared with an award of

$4,070,473.00, which is 22% of the settlement, representing a 1.1 multiplier.  (Id. at 24.)  Lead

Plaintiff posits that "in contingent litigation, lodestar multiples between 2 and 4 are routinely

awarded by courts in the Third Circuit," and as such "the fee requested by Lead Counsel . . . [is]

well within the range of lodestar multipliers routinely awarded by courts." (Id.)

The lodestar cross-check confirms the reasonableness of lead counsel's requested award.

Exhibit D of the Lebovitch Declaration provides a schedule of the time spent by each attorney

and professional staff member employed by lead counsel and the lodestar calculations based on

lead counsel's current billing rates, producing a total lodestar of $3,666,163.00.  Courts in the

**NOT FOR PUBLICATION**

Third Circuit have approved percentage-of-recovery awards of three or four times the amount calculated by the lodestar method.  In re Cendant PRIDES, 243 F.3d at 742 (noting that "multiples ranging from one to four are frequently awarded in common fund cases where the lodestar method is applied" and strongly suggesting to district court multiplier of three).  As noted the requested 22% award, resulting in an award $4,070,473.00, is only a 1.1 multiplier of the total lodestar of $3,666,163.00.

Given that all seven factors, as well as the lodestar cross-check, support lead counsel's 22% award of attorneys' fees, the Court grants Lead Plaintiff's motion for attorneys' fees of 22% of the net settlement.

### C.    Motion for Reimbursement of Litigation Expenses

Lead counsel requests a reimbursement of litigation expenses of $497,847.75.  Lead Plaintiff states that "Lead Counsel respectfully requests reimbursement of those reasonable expenses, along with interest at the same rate as earned by the Settlement Fund."  (Id. at 25.) Lead counsel's expenses are presented in Exhibit F of the Lebovitch Declaration.

Lead counsel's expenses appear reasonable, and Exhibit F of the Lebovitch Declaration adequately documents the expenses for the Court.  Accordingly, the Court grants Lead Plaintiff's motion for reimbursement of expenses of $497,847.75

**NOT FOR PUBLICATION**

**CONCLUSION**

For the foregoing reasons, Lead Plaintiff's motion for approval of the partial class action settlement and the Plan of Allocation and motion for an award of attorneys' fees and reimbursement of litigation expenses are granted.

March 31, 2008                                      **s/William H. Walls**
                                                   United States Senior District Judge

**NOT FOR PUBLICATION**

**Appearances**

Jeffrey N. Leibell
Mark Lebovitch
Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
> Attorneys for Lead Plaintiff Teachers' Retirement System of Louisiana and the
> Class

Matthew Oliver
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ 07068
> Attorney for Plaintiffs Special Situations Fund, III, L.P. and Special Situations
> Cayman Fund, L.P.

Keith Levenberg
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
> Attorney for Defendants Rudolph Acosta, Jr., Paul Desocio, and Barry S.
> Rutcofsky

Eric Tunis
Edwards Angell Palmer Dodge LLP
51 John F. Kennedy Parkway
Short Hills, NJ 07078
> Attorney for Defendant BDO Seidman, LLP

Robert L. Hickok
Christopher J. Huber
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103
> Attorneys for Defendants Janney Montgomery Scott LLC, Pacific Growth
> Equities, Inc., and Roth Capital Partners, LLC

William J. Bailey
Huntington Bailey, L.L.P.
312 Kinderkamack Road
Westwood, NJ 07675
> Attorney for Defendants Mark Cocchiola and the Estate of Marco Cocchiola